# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2898

_____

United States of America,                  *
                                           *
              Appellee,                     *
                                           *
      v.                                    *
                                           *
Pelayo Jose Cuervo, also known as          *
Jose Cuervo, also known as Pelayo Joe       *
Cuervo, also known as Anthony              *
Badessa, also known as Tattoo Joe,          *
also known as Tattoo Badessa,              *
                                           *
              Appellant.                    *

Appeals from the United States
District Court for the
Southern District of Iowa.

_____

No. 02-3196

_____

United States of America,                  *
                                           *
              Appellee,                     *
                                           *
      v.                                    *
                                           *
Robert Lee Norman, also known as           *
Skunk,                                      *
                                           *
              Appellant.                    *

_____

No. 02-3223
_____

United States of America,                    *
                                              *
                    Appellee,                 *
                                              *
        v.                                    *
                                              *
Russell J. Schoenauer,                        *
                                              *
                    Appellant.                *


_____

No. 02-3362
_____

United States of America,                    *
                                              *
                    Appellant,                *
                                              *
        v.                                    *
                                              *
Russell J. Schoenauer,                        *
                                              *
                    Appellee.                 *
                                    _____

                    Submitted:   October 23, 2003

                    Filed:   January 22, 2004
                                    _____

-2-

Before RILEY, HEANEY, and SMITH,  Circuit Judges.
_____

HEANEY, Circuit Judge.

Appellants Robert Lee Norman, Russell J. Schoenauer, and Pelayo Jose Cuervo were convicted of numerous narcotics and firearms offenses, many of which related to what the government alleged to be a conspiracy to distribute controlled substances that lasted from 1978 through 2001.  Norman, Schoenauer, and Cuervo appeal their conspiracy-related convictions, and Norman and Schoenauer appeal their resulting sentences.  Schoenauer further appeals the forfeiture of his property, and the firearms convictions that were unrelated to the conspiracy.  The government cross-appeals the district court's[1] two-level downward sentencing departure for Schoenauer.  We affirm.

## PROCEDURAL BACKGROUND

On March 28, 2001, a grand jury returned a multiple count indictment charging the defendants and others with various narcotics and firearms offenses.  The government filed several superseding indictments, culminating in a fourth superseding indictment filed on December 19, 2001.  Through this voluminous final charging document, the grand jury indicted Norman and Schoenauer for maintaining a continuing criminal enterprise,[2] and indicted all three defendants for conspiring to distribute one thousand kilograms or more of marijuana, five hundred grams or more

---

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

[2]21 U.S.C. § 848.

of methamphetamine, and five kilograms or more of cocaine.[3] The defendants were also charged with using firearms in furtherance of the conspiracy,[4] as well as numerous substantive counts of distributing controlled substances.[5] Lastly, the indictment sought forfeiture of several properties connected to the drug offenses, and charged Schoenauer with three additional unrelated firearms offenses.[6]

Following a lengthy jury trial, the defendants were convicted of many of the charged counts.[7] Norman was convicted of maintaining a continuing criminal enterprise and conspiracy to distribute five hundred or more grams of methamphetamine, between five hundred grams and five kilograms of cocaine, and between one hundred grams and one thousand kilograms of marijuana. He was also convicted of nine substantive counts of distributing methamphetamine, and one count of using a firearm in furtherance of the conspiracy. Cuervo was convicted of conspiracy to distribute five hundred or more grams of methamphetamine, four substantive counts of distributing methamphetamine, and one count of using a firearm in furtherance of the conspiracy. Schoenauer was convicted of conspiracy to distribute between fifty and five hundred grams of methamphetamine and between one hundred grams and one thousand kilograms of marijuana, as well as two substantive counts of distributing methamphetamine. The jury subsequently found several of Schoenauer's properties subject to forfeiture. Schoenauer was then tried separately and found guilty of three counts of unlawful possession of a firearm.

---

[3]21 U.S.C. §§ 846 and 841(a)(1).

[4]18 U.S.C. § 924(c)(1)(A).

[5]21 U.S.C. § 841(a)(1).

[6]18 U.S.C. § 922(g)(9).

[7]Other counts resulted in acquittals or were dismissed.

Norman was sentenced to a term of 292 months imprisonment on the continuing criminal enterprise count and seven of the distribution counts, to run concurrently with a term of 240 months on another distribution count. He was also given a 60-month consecutive sentence for his firearm violation, for a total prison term of 352 months. Cuervo was sentenced to 210 months imprisonment for his role in the conspiracy and his distribution convictions, as well as a consecutive 60-month term for his firearm violation. Schoenauer was given a 210 month sentence for his conspiracy and distribution convictions, to run concurrently with a 120-month sentence for his firearms violations.

On appeal, the defendants make myriad arguments relating to their convictions and sentences. Norman contends that his convictions cannot stand because: 1) the indictment was unconstitutionally vague as to the continuing criminal enterprise and conspiracy charges; 2) there was a variance in the proof and insufficient evidence to support convictions for the continuing criminal enterprise and conspiracy charges; 3) the district court erred in its response to a jury question; 4) the jury instruction for the continuing criminal enterprise charge was improper; 5) the charges for using firearms in furtherance of the conspiracy improperly charged multiple offenses, charged continuing offenses, and violated the Ex Post Facto Clause; 6) his conviction for using a firearm in furtherance of the conspiracy was for conduct beyond the statute of limitations; and 7) his conviction for using a firearm in furtherance of the conspiracy was not supported by sufficient evidence. As to his sentence, Norman argues that the district court used the wrong version of the United States Sentencing Guidelines, erred by enhancing his sentence under the theory that he supervised five or more people, and erred in its drug quantity determination.

Schoenauer argues that: 1) the indictment was unconstitutionally vague as to his conspiracy and drug distribution charges; 2) there was insufficient evidence to support convictions on these charges; 3) there was a variance between the evidence and allegations on his conspiracy and drug distribution charges; 4) the district court

erred by admitting the government's expert testimony on Schoenauer's finances; 5) the forfeiture verdicts were infected by myriad errors; 6) the convictions for unlawful possession of a firearm cannot stand because the charging statute was unconstitutionally vague as applied to Schoenauer; 7) the district court committed reversible evidentiary errors during Schoenauer's trial for unlawful possession of a firearm; and 8) his convictions for unlawful possession of a firearm were not supported by sufficient evidence. Lastly, Schoenauer contends that the district court erred at sentencing in its drug quantity determination.

Cuervo joins Norman and Schoenauer in arguing the deficiency of the indictment and evidence as to the conspiracy count. He further argues that his conviction for using a firearm in furtherance of the conspiracy cannot stand because his conduct was beyond the statute of limitations, there was a fatal variance between the evidence and the indictment, and his conviction violated the Ex Post Facto Clause. He further argues that he was prejudiced by being charged with multiple firearms violations. Lastly, he claims that the evidence was insufficient to sustain his four convictions for distributing methamphetamine.

The government cross-appeals Schoenauer's sentence. It argues that the district court erred by granting Schoenauer a two-level downward departure, contending that the departure was based on improper or irrelevant factors under the Guidelines.

## FACTUAL BACKGROUND

This case reaches us following a jury verdict of guilty, and accordingly we review the evidence in the light most favorable to the verdict, accepting all reasonable inferences supported by the evidence. United States v. Kamerud, 326 F.3d 1008, 1012 (8th Cir. 2003). Robert Lee Norman and Pelayo Jose Cuervo were both longstanding members of the same motorcycle club, the Sons of Silence. Norman

was a charter member of the Boone, Iowa chapter of the club, joining in the late 1970s. Norman also owned an automobile repair and restoration business, Ballistic Auto. Cuervo worked for Norman at Ballistic Auto. Russell J. Schoenauer was an accountant by trade, but was also involved in numerous other business ventures. Schoenauer performed tax preparation and other accounting services for Norman and Ballistic Auto. As evidenced below, Norman, Cuervo, and Schoenauer were all deeply involved in the use and distribution of controlled substances.

Norman married Marylin Corbin in 1978, and the couple remained married until 1982. According to Corbin, Norman grew marijuana at their home throughout the duration of their marriage, and also acquired marijuana from Steve Henry. At least twice a month during their marriage, Norman would supply large quantities of the drug to others, who would pay Norman for it at a later date–a practice known as "fronting" the drug. Norman also manufactured a substance he referred to as "crank" at their home during this time, and regularly carried a small pistol.

Rodney Backous testified that he had known Norman since at least 1982, and that Norman had been involved in the distribution of controlled substances since Backous met him. Backous would receive small quantities of marijuana and cocaine from Norman, and when the drugs were available, Backous would supply Norman with up to a pound of marijuana, and quantities as large as an ounce of cocaine throughout the 1980s. For several years, Norman supplied Backous with one ounce quantities of methamphetamine for resale, sometimes fronting the drugs to Backous. Backous had seen Norman in possession of what he estimated to be $20,000 or $30,000 in cash, and saw him count out over $12,000 in cash once when Norman was trying to procure a pound of methamphetamine. In the mid-1990s, Backous was present at a meeting between Norman and Schoenauer about Norman's desire to purchase methamphetamine. Norman advised Schoenauer that he needed money for the purchase, but it is not clear if Norman was asking Schoenauer to personally fund the transaction.

Brian Holst was a member of the Sons of Silence from 1979 through the mid-1980s, and had known Norman since 1978. He met Cuervo through the motorcycle club in the mid-1980s. In the 1980s, Norman paid Holst to drive him to Colorado in order to pick up cocaine and bring it back to Iowa. Holst had his own source for methamphetamine in the southwest, and from 1992 through at least 1994, Holst supplied one pound quantities of methamphetamine to Norman. In all, Holst estimated that he provided Norman with fifteen to twenty pounds of methamphetamine. Norman bought methamphetamine from Holst for a price of $12,000 to $16,000 a pound and paid in cash. Holst saw Norman with approximately $40,000 to $50,000 during one of these drug purchases. Holst also saw Norman and Cuervo with firearms, but not during the drug transactions.

Mark McPherson was an original member of the Boone, Iowa chapter of the Sons of Silence, and held the title of regional president for the club for roughly thirteen years. He had known Norman since the 1970s, and Cuervo since approximately 1980. On at least two occasions, McPherson and Norman pooled their money to purchase large quantities of methamphetamine, once from Brian Holst, and once from a Minnesota supplier. During his association with Norman and Cuervo, he had observed them in possession of firearms.

Corey Pendarvis was also a member of the Boone, Iowa chapter of the Sons of Silence motorcycle club. In 1992, Pendarvis traveled to Fort Dodge, Iowa and picked up a pound of cocaine for Norman. A few times in the early 1990s, Norman arranged to store his drugs–either cocaine or methamphetamine–at Pendarvis's house before selling them. Pendarvis testified that Norman would store up to a kilogram of cocaine, but a considerably smaller portion of methamphetamine. Pendarvis further testified that he had seen Norman in possession of firearms, as well as what he termed as "a huge bag of pot." (Trial Tr. Vol. III at 359.)

According to Delane Evans, Norman began fronting cocaine to him in 1982. Evans bought one-eighth ounce quantities approximately twice a week. After several months, this increased to quarter ounce purchases, and eventually to one ounce quantities of the drug. Evans acquired one ounce quantities of cocaine from Norman on a regular basis for over a year. Years later, beginning around 1992, Norman began selling methamphetamine to Evans. As with the cocaine, Norman fronted relatively small quantities to Evans, progressing to one ounce quantities. Evans continued to purchase methamphetamine from Norman for roughly four years. Evans also purchased a quarter pound of marijuana from Norman on one occasion, and testified that he observed firearms in Norman's home.

Scott Gones knew both Norman and Cuervo from his association with the Sons of Silence motorcycle club. Gones was a member of the club from approximately 1984 through 1999. He testified that Cuervo had a gun with him nearly everywhere he went. In May of 1996, Gones was present when "Big John," his associate in the Paris, Illinois chapter of the Sons of Silence, brokered a deal to receive pound quantities of methamphetamine from Norman. Through 1996, Norman provided at least eight pounds of methamphetamine to Gones at a rate of $10,000 per pound. Gones once picked up a two pound quantity of methamphetamine from Cuervo, also for the price of $10,000 per pound. Both Cuervo and Norman fronted the drugs, allowing Gones to pay at a later date.

According to Jewel Ulrick, he met Norman in the summer of 1995. The two talked about drugs, and Norman asked if Ulrick could provide him with large quantities of methamphetamine. Norman indicated that he could get money for drug purchases very quickly from his accountant. Ulrick agreed to provide one pound of methamphetamine, and Norman gave Ulrick $17,000 for the purchase. Ulrick was not able to get the drug and eventually returned Norman's money. Ulrick tried to get methamphetamine for Norman one other time but was not successful.

Kevin Hummel was a member of the Iron Horsemen motorcycle club, and first started associating with Cuervo in 1996. Hummel often observed Cuervo carrying a .380 caliber pistol, and sold Cuervo a .45 caliber handgun in 1997 or 1998. In late 1996 or early 1997, Norman approached Hummel about purchasing ten pounds of methamphetamine from Hummel's California source, offering Hummel $10,000 to effectuate the transaction. Hummel rejected the offer.

In either 1990 or 1991, brothers Barry Scarcello and Daniel Burns began to purchase cocaine from Norman. They usually purchased ounce or half ounce quantities. These transactions happened every week or two weeks while the drug was available. By early 1992, the brothers shifted their business to methamphetamine, and started buying one or two ounces from Norman every week or two weeks. They stopped buying from Norman in 1992 when Burns faced a criminal charge, but started again in 1995, buying weekly from Norman until 1997. Sometimes Pendarvis delivered the drugs to the brothers for Norman. According to Burns, Norman told him that Schoenauer was his accountant and "money man," (Trial Tr. Vol. IX at 1921), but did not elaborate on this relationship.

Chris Borst worked with Norman at Ballistic Auto. Drug customers would occasionally stop by Ballistic Auto to pick up one ounce amounts of controlled substances. Eventually, Borst was introduced to Schoenauer. Norman and Borst met with Schoenauer several times in the 1990s, often discussing Ballistic Auto, but also delving into the topic of drugs and drug money. Norman and Borst told Schoenauer they were investing drug proceeds into Ballistic Auto, and Schoenauer suggested that they buy money orders and then deposit them in Ballistic Auto's bank account, giving the impression that Ballistic Auto had a large stream of legitimate income. Norman advised Borst to contact Schoenauer in the event of tax problems at Ballistic Auto. Schoenauer was paid for his services in methamphetamine.

Borst met Cuervo at Ballistic Auto in the summer of 1995, when Cuervo dropped off a pound of methamphetamine for Norman. Norman sent Borst and Cuervo on a trip to procure methamphetamine from an Illinois source, but the two were unsuccessful. Before they left, Borst observed Norman hand Cuervo money for the drug buy. During this trip, Cuervo carried a .38 caliber pistol.

Borst saw Norman with large amounts of cash, drugs, and weapons. He specifically recalled seeing Norman in possession of two handguns and an AK-47 assault rifle. Norman sold Borst ounce quantities of methamphetamine on several occasions in 1992. In 1994 and 1995, Norman gave Borst money to purchase methamphetamine for Norman every two or three weeks. Eight to ten of these transactions involved $8,000 in cash and half pound quantities of the drug. Borst also picked up various amounts of methamphetamine for Norman at Norman's trailer home, and saw over a pound of methamphetamine at the trailer. He testified that he picked up methamphetamine for Norman at other locations as well, including a storage shed in which he saw up to five pounds of the drug. Borst estimated that he handled over twenty pounds of methamphetamine for Norman. Once, Norman directed Borst to count out money that was hidden in Norman's house. The amount totaled $93,000.

On one occasion, Borst traveled with Norman to pick up a 1967 Pontiac Firebird in Colorado. A quantity of methamphetamine was hidden within the door panels of this car, which Norman retrieved when he disassembled the door panels at Ballistic Auto. Ballistic Auto was also used to dismantle the rear end of a vehicle which had been used to store one pound of methamphetamine. Five pounds of methamphetamine were recovered when Ballistic Auto was used to take apart the transmission of a 1968 Chevrolet Impala, which had been hollowed out to store the drugs.

Joe Wetherby testified that he worked as a mechanic at Ballistic Auto from 1995 to 1999. While he worked there, Wetherby observed Norman in possession of firearms, and stored Norman's weapons for him at one time. Norman also regularly sold Wetherby small amounts of methamphetamine and used Wetherby as a drug courier. Twice Norman sent Wetherby to Kansas to pick up large quantities of methamphetamine from Cuervo. On the first of these trips, Norman gave Wetherby an envelope full of money for Cuervo, which Wetherby exchanged for drugs. On Wetherby's return, Norman retrieved the package and indicated that it contained five pounds of methamphetamine. Wetherby's second trip to Kansas involved the same amount of methamphetamine, which he again delivered from Cuervo to Norman. Wetherby saw Cuervo twice bring Norman similar packages at Ballistic Auto. Cuervo carried a gun in his vehicle during these transactions. Through Wetherby, Norman bought a twelve ounce quantity and a two ounce quantity of methamphetamine from Phillip Gross. Gross verified that Wetherby bought significant quantities of methamphetamine, which Gross would get from Las Vegas. Wetherby told Gross that he was purchasing for his employer, presumably Norman. Wetherby testified that on another occasion, Norman gave him $40,000 with orders that Wetherby find and buy up to ten pounds of methamphetamine, but Wetherby was not successful. During his tenure at Ballistic Auto, Wetherby came to know Schoenauer. Norman introduced Schoenauer as Ballistic Auto's accountant. Wetherby remembered a time when Schoenauer shared a line of cocaine with him, but did not recall Schoenauer being involved in any other drug activity.

Patrick Rinkert met Schoenauer when he started doing construction work for Schoenauer in 1993. Eventually, the two formed a concrete business together, but their business relationship ended in 1997. From 1993 through the spring of 1997, Rinkert estimated that he received methamphetamine from Schoenauer ten or fifteen times. Many times Schoenauer would deliver the drugs to Rinkert at construction job sites, but Rinkert also received methamphetamine from Schoenauer at his office and his house. Rinkert specifically recalled once receiving a small amount of

methamphetamine from Schoenauer in the parking lot of Prairie Meadows casino in January of 1997, and again at a construction site in March of 1997. Schoenauer carried a nine-millimeter pistol with him during this transaction and on many other occasions.

Norman introduced a fellow Sons of Silence member, James Pratt, to Schoenauer in 1995. Pratt did maintenance and construction work on Schoenauer's properties, and eventually went into business with Schoenauer. From 1995 through early 2001, Schoenauer provided Pratt with small amounts of methamphetamine, often for no remuneration. Pratt estimated that during the course of their relationship, Schoenauer supplied him with a total of twenty six to twenty eight ounces of methamphetamine.

Lajean Johannes testified that she came to know Schoenauer from babysitting his daughter. She cleaned Schoenauer's apartment once in 1993, and Schoenauer gave her $100 and a user quantity of methamphetamine and marijuana. She began to frequent Schoenauer's apartment more regularly in 1997, and Schoenauer provided methamphetamine to Johannes during these meetings. Johannes testified that she saw Schoenauer in possession of what she considered a large quantity of methamphetamine at this time, estimated to be an "eight-ball." (Trial Tr. Vol. VII at 1520.) Neither the prosecutor nor defense counsel asked Johannes to elaborate on what measure she associated with an "eight-ball" of a controlled substance, although other witnesses testified that it equated to one eighth of an ounce.

Marie Blunt testified that she had known Schoenauer for approximately eight years, and during that time he had shared methamphetamine and marijuana with her perhaps fifty times. She also often saw Norman with methamphetamine, which her husband would buy from Norman.

-13-

Jennifer Kent testified that Schoenauer used her escort service. She recalled going to his office and using methamphetamine provided by Schoenauer. Schoenauer paid for her services in both cash and methamphetamine.

Rick Elbert used Schoenauer as his accountant. On many occasions, Elbert bought marijuana from Schoenauer, typically in one to four ounce quantities. Elbert testified that Schoenauer once tried to get marijuana from the Sons of Silence, but was unsuccessful.

During the 1990s, the defendants all had noteworthy contacts with law enforcement. Iowa State Trooper Mike Winter effectuated a traffic stop on Norman in 1994. A search of Norman and the motorcycle he was riding revealed two firearms and a small amount of marijuana. South Dakota law enforcement officer Kevin Thom arrested Cuervo during a motorcycle rally. Cuervo had over $4,000 cash on him, which he claimed was for the possible purchase of vehicles for Ballistic Auto. Thom confirmed this story with Norman, who suggested that Thom speak with Norman's tax accountant for further verification. Los Angeles, California officers Mark Wood and Chris Christopher knew Cuervo from a traffic stop in September of 1997. A search of the car in which Cuervo was a passenger revealed nearly $28,000 in cash and a handgun. Again, Norman intervened and informed the officers that the money was for the possible purchase of vehicles, and that the officers could verify his story with Schoenauer. Schoenauer himself was stopped following a hit and run accident in early 1999. A search of Schoenauer's car and person uncovered a small amount of methamphetamine and marijuana.

Brad Richards, a senior auditor with the Bureau of Alcohol, Tobacco, and Firearms (ATF), testified on behalf of the government. Richards was offered as an expert to establish that Schoenauer's wealth exceeded his stated income. Richards reviewed Schoenauer's personal tax returns for the years 1992 through 1998, and discerned that Schoenauer had a cumulative disposable income of $262,000.

Richards estimated that during roughly the same period, Schoenauer's investments totaled nearly $2.9 million. He concluded that Schoenauer had about $2.6 million in unexplained income for this time frame.

## ANALYSIS

## I.  SUFFICIENCY OF THE INDICTMENT ON CONSPIRACY AND CONTINUING CRIMINAL ENTERPRISE CHARGES

Norman argues that the fourth superseding indictment was unconstitutionally vague with regard to the continuing criminal enterprise charges, and all three defendants argue that the same holds true for the conspiracy charge, necessitating a reversal of their respective convictions for those offenses. We review challenges to the sufficiency of an indictment de novo. United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997). Where a defendant does not attack the sufficiency of the indictment before trial, however, "we apply a more deferential standard of review." United States v. White, 241 F.3d 1015, 1021 (8th Cir. 2001). Although Schoenauer questioned the sufficiency of the indictment prior to trial, counsel for Norman conceded at oral argument that he did not, and the record does not reflect that Cuervo either did so personally or joined in a codefendant's motion to that effect.[8] Thus, while Schoenauer enjoys the benefit of de novo review, we use less scrutiny in considering Norman's and Cuervo's arguments. Notwithstanding our varying standards of review for the defendants, we find no defendant is entitled to relief on this ground.

---

[8]Cuervo claims that he joined codefendant Steven Henry's motion to dismiss the indictment, but the record reflects that he did not file any document stating his desire, and although he was present at the hearing on the motion with counsel for the other codefendants, he neither participated in Henry's argument nor informed the court that he wished to join the motion. (See generally Oct. 26, 2001, Hr'g Tr.)

Our review of the indictment for the continuing criminal enterprise and conspiracy charges convinces us that they are not constitutionally deficient. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see Dolan, 120 F.3d at 864 ("To be sufficient, an indictment must fairly inform the defendant of the charges against him and allow him to plead double jeopardy as a bar to future prosecution."). Typically an indictment is not sufficient only if an essential element of the offense is omitted from it. White, 241 F.3d at 1021.

In Count 1, the grand jury charged that Norman supervised, organized, or managed five or more individuals, and in concert with them committed a series of drug possession and distribution violations, obtaining substantial income as a result. (Appellant Norman's App. Vol. I at 2-3.) This closely tracks the language of the statute defining the elements of a continuing criminal enterprise. See 21 U.S.C. § 848(c). Moreover, the indictment states the relevant time period, the place where the crime was committed, and details the methods used to effectuate the crime. Count 2 of the indictment was similarly sufficient; it stated the relevant time period charged, the place the crime had been committed, and the actors involved. It further charged that the defendants, with others named and unnamed, conspired "to commit an offense against the United States, namely to knowingly and intentionally distribute controlled substances" including marijuana, cocaine, and methamphetamine. (Appellant Norman's App. Vol. I at 4.) This language adequately sets forth the conspiracy charge. Moreover, Counts 1 and 2 of the indictment referenced the continuing criminal enterprise and conspiracy statutes, respectively, and further referenced relevant controlled substance statutes. See White, 241 F.3d at 1021 (finding an indictment sufficient in part because of references to relevant criminal statutes).

-16-

In essence, the defendants argue that due to its vagueness, the indictment left them without notice of what charges they would be defending against. We agree that the indictment's scope is broad, as it alleged crimes which continued for over two decades and took place throughout the country, involving coconspirators both known and unknown. The indictment was clarified by a Bill of Particulars filed by the government on August 10, 2001. This document expounded on the allegations in the indictment, providing the defendants with more specific information in order to assist their defense. A Bill of Particulars is an appropriate vehicle for curing deficiencies as to the form of an indictment. Dolan, 120 F.3d at 866-67. We find that the defendants were adequately informed of the charges they faced, and thus affirm the constitutionality of the indictment as to the continuing criminal enterprise and conspiracy charges.

## II. SUFFICIENCY OF THE EVIDENCE FOR THE CONTINUING CRIMINAL ENTERPRISE, CONSPIRACY, AND RELATED DRUG CHARGES

Norman argues that there was insufficient evidence to convict him of maintaining a continuing criminal enterprise or conspiracy. Cuervo and Schoenauer make the same arguments with regard to their conspiracy convictions. Cuervo further challenges the sufficiency of the evidence for his four controlled substance violations.[9]

We review the sufficiency of the evidence de novo. United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003). Following conviction, we view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences that support the verdict. Id. "We uphold the jury verdict if there is an interpretation of the evidence that would allow a reasonable jury

---

[9]Schoenauer and Norman also challenge the sufficiency of the evidence for their respective firearms convictions, which we address in a different section.

to find the defendant guilty beyond a reasonable doubt." United States v. Purvis, 114 F.3d 737, 738-39 (8th Cir. 1997). The "issue of witness credibility is virtually unreviewable on appeal because it is 'preeminently the job of the finder of fact.'" United States v. Rayl, 270 F.3d 709, 713 (8th Cir. 2001) (quoting United States v. E.R.B., 86 F.3d 129, 130 (8th Cir. 1996)).

## A. Norman's Continuing Criminal Enterprise Conviction

To sustain a conviction for maintaining a continuing criminal enterprise, the government must present evidence that the defendant violated a felony controlled substance law as part of a continuing series of three or more such violations; that he did so through the concerted action of five or more people that he was supervising, organizing, or managing; and that he derived substantial income or resources as a result. 21 U.S.C. § 848; United States v. Jelinek, 57 F.3d 655, 657 (8th Cir. 1995).

Beginning in 1978, Robert Norman engaged in many drug transactions involving marijuana, cocaine, and methamphetamine. There was direct evidence tying Norman to purchases and sales of quantities of a pound or more of controlled substances, and on some occasions as much as five pounds. At trial, the government showed that Norman used Brian Holst, Joe Wetherby, Corey Pendarvis, Chris Borst, and Cuervo as runners and intermediaries to buy and sell large quantities of drugs. Moreover, reasonable inferences drawn from trial testimony indicate that Norman may have maintained control over others as well, including Daniel Burns, Barry Scarcello, Delane Evans, and perhaps Scott Gones. Contrary to Norman's position, the evidence does not merely show a series of discrete buyer/seller transactions. Rather, it proved that he was involved in an extensive, long-term, concerted drug trafficking scheme, often directing his subordinates to assist him with the transactions. Norman was also linked to substantial amounts of cash through personal observations of trial witnesses, indicating that Norman derived substantial

income as a result of his drug dealings. As such, we find sufficient evidence to sustain Norman's conviction for maintaining a continuing criminal enterprise.

**B.     The Defendant's Conspiracy Convictions**

A conspiracy conviction will be upheld where the evidence shows that a conspiracy existed for an illegal purpose, the defendant knew of the conspiracy, and the defendant intentionally joined it. United States v. Oleson, 310 F.3d 1085, 1089 (8th Cir. 2002). In other words, the government must show an agreement between at least two people, and that the agreement's objective was a violation of the law. United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003). Evidence of a tacit understanding to join the conspiracy will sustain a conviction, United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003), but a defendant's mere presence or knowledge that someone else intends to sell drugs is not sufficient to convict him, Fitz, 317 F.3d at 882.

As our factual recitation indicates, there is no question that the government established a sweeping conspiracy to distribute marijuana, cocaine, and methamphetamine over a several year period. It is also beyond dispute that Norman was integrally involved in the conspiracy, buying and selling drugs as well as directing others to do the same on his behalf.

We find the evidence similarly strong as to Cuervo's involvement in the conspiracy. Joe Wetherby testified that he twice picked up five pounds of methamphetamine from Cuervo and delivered them to Norman. On other occasions, Cuervo would bring similar packages to Norman at Ballistic Auto. Chris Borst saw Cuervo deliver a pound of methamphetamine to Norman at Ballistic Auto in 1995, and Cuervo joined Borst on a trip to buy methamphetamine for Norman. Having established that a conspiracy to distribute controlled substances existed, this evidence is more than sufficient to associate Cuervo with the conspiracy.

With regard to Schoenauer, we are troubled by the conspiracy conviction. We reiterate the government's burden at trial, which is to prove beyond a reasonable doubt that Schoenauer was a voluntary and knowing participant in a specific conspiracy. United States v. Desena, 260 F.3d 150, 154-55 (2d Cir. 2001); United States v. Andujar, 49 F.3d 16, 22 (1st Cir. 1995). The jury found Schoenauer conspired to distribute fifty to five hundred grams of methamphetamine, and only one hundred grams or more of marijuana, rather than the one thousand kilograms alleged. Granting the government the benefit of all reasonable inferences, we find the totality of evidence against Schoenauer was sufficient to support the jury verdict.

Schoenauer was a regular user of controlled substances, favoring methamphetamine and marijuana. On some occasions, Schoenauer obtained the drugs from Norman. Schoenauer, in turn, provided user quantities of methamphetamine and marijuana to his friends and associates on many occasions. As accountant, Schoenauer offered financial advice regarding Ballistic Auto and acted as Norman's "money man." There was no direct testimony that Schoenauer shared in the profits from Norman's drug sales, but testimony did reveal that Schoenauer had significant untaxed income during some years of the alleged conspiracy. The government argued to the jury, and contends before this court, that the jury could infer from this testimony that Schoenauer participated in the conspiracy. Schoenauer argues that he was nothing more than Norman's accountant, who used and distributed small quantities of drugs to friends and associates, and that he did not invest in Norman's drug activities or profit from them.

Initially, we note that there is no direct evidence of Schoenauer's participation in the conspiracy. Thus, the question before us is, could a reasonable jury have inferred Schoenauer's participation from the evidence presented at trial? We do not believe that the evidence with respect to Schoenauer's drug use and sales is sufficient to support the conspiracy conviction. Several times throughout the 1990s, Schoenauer provided small quantities of methamphetamine and occasionally

marijuana to others. Despite many transactions, Schoenauer did not typically accept money for the drugs. Rather, he would usually give away user quantities of drugs or trade them for services that benefitted him. There is no evidence that he obtained these drugs from Norman with the understanding that he would redistribute them. Nor is there any direct evidence that Norman shared in the benefits of Schoenauer's drug transactions. Under these circumstances, Schoenauer's drug sales give little support to the conspiracy conviction. Cf. United States v. Townsend, 924 F.2d 1385, 1391 (7th Cir. 1991) ("[T]he liability of members of the distribution chain is predicated upon the notion that participants at different levels in the chain know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit."). Instead, Schoenauer's drug transactions evince discrete transactions unrelated to the conspiracy.

We likewise find unpersuasive the government's argument that Schoenauer's role as accountant and financial advisor for Norman and Ballistic Auto proved his participation in the drug conspiracy. The government's principal witness on this issue was Chris Borst. Borst testified that he met with Schoenauer several times in an effort to ensure Ballistic Auto was "legitimate." According to Borst, Schoenauer gave a number of suggestions, none of which were illicit. When Schoenauer was informed that Borst and Norman were investing drug money into Ballistic Auto, he proposed a way for them to do so without raising suspicions. Clearly, this type of advice could subject Schoenauer to liability for crimes such as conspiring to commit money laundering or aiding and abetting money laundering. See e.g., United States v. Vanhorn, 296 F.3d 713, 717-18 (8th Cir. 2002) ("The essential elements of a . . . money laundering violation are proof that the defendant conducted a financial transaction involving the proceeds of unlawful activity with knowledge that the funds were proceeds of an unlawful activity and with the intent 'to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" (quoting 18 U.S.C. § 1956(a)(1)(B)(i)); cf. United States v. Dugan, 238 F.3d 1041, 1043-44 (8th Cir. 2001) (finding evidence was

sufficient to establish conspiracy to commit money laundering where defendant knowingly concealed proceeds of drug activities). It does not, however, establish that Schoenauer joined Norman's conspiracy to distribute controlled substances; no evidence suggested that Norman ever followed Schoenauer's suggested approach, or that money from Ballistic Auto was used to effectuate any further drug transactions. Thus, we cannot say that Schoenauer's limited advisory role with regard to Norman's financial affairs transformed him into a member of this overarching drug conspiracy.

Perhaps the strongest evidence that Schoenauer participated in Norman's extended operation in drug trafficking is the testimony of Daniel Burns, Jewel Ulrick, and Rodney Backous. Burns told the jury that Norman referred to Schoenauer as his "money man," and Ulrick said that Norman told him he could get large sums of money quickly from his accountant. Backous testified that he was present when Norman asked Schoenauer to fund Norman's purchase of methamphetamine. It is not clear whether Schoenauer was investing in Norman's enterprise or simply holding Norman's money for him. An expert government witness testified that Norman had roughly $2.6 million in unexplained income during the period of the conspiracy, testimony designed to create the inference that Schoenauer was investing in and profiting from Norman's drug trafficking. Standing alone, this evidence would probably not be sufficient to sustain the conviction. To hold that the safeguarding of a client's funds subjects the fiduciary to conspiratorial liability if those funds are used for criminal means is simply too broad and sophistic a proposition to withstand scrutiny.

When considering all the evidence against Schoenauer in its totality, however, we believe a reasonable jury could find Schoenauer had participated in the conspiracy. Schoenauer advised Norman on how to disguise drug proceeds as legitimate business revenues. Moreover, there was consistent testimony that Norman described Schoenauer as his source for money to effectuate Norman's drug transactions. Obviously, this would be a much stronger case if there was direct

evidence that Schoenauer was investing his own money in the drug trafficking enterprise. Again, though, the totality of evidence supports that inference, as the government presented testimony that Schoenauer's wealth did not match his stated income for some years of the conspiracy. Although Schoenauer gave alternative explanations for this wealth, in light of the circumstances, it was reasonable to infer that the money was connected to the drug conspiracy. Accordingly, although the government's case was weak, we cannot say that Schoenauer's conspiracy conviction was unreasonable.

## C.   Cuervo's Substantive Distribution Convictions

As Cuervo admitted at oral argument, his convictions for distributing methamphetamine were established by trial testimony of government witnesses, particularly Joe Wetherby. In arguing for reversal, he points us to Wetherby's history of drug use, prior convictions, plea agreement with the government, inconsistency with other testimony, and failure to provide corroborating evidence. Each of these matters is relevant only as to whether Wetherby was a credible government witness. Time and again we have stated, and repeat so here, that "this court cannot review the credibility of trial witnesses on appeal." United States v. McCarthy, 244 F.3d 998, 1001 (8th Cir. 2001). Viewing the evidence in the light most favorable to the government, we find it sufficient to sustain Cuervo's substantive convictions for distributing methamphetamine.

## III.   VARIANCE CLAIMS FOR CONTINUING CRIMINAL ENTERPRISE, CONSPIRACY, AND RELATED DRUG CHARGES

Norman maintains that a variance existed between the allegations in the indictment and the evidence presented at trial with regard to the continuing criminal enterprise. Schoenauer and Cuervo join this argument as to the defendants' conspiracy convictions. Schoenauer individually argues that there was also a

variance between the allegations and the evidence in support of the two substantive counts of distributing methamphetamine for which he was convicted. We review claims of variances between the indictment and proof at trial to determine if the variance substantially prejudiced the defense. United States v. Ghant, 339 F.3d 660, 662 (8th Cir. 2003); United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000) (explaining that a variance only results in a reversal if the defendant's right to notice of the crimes charged has been infringed).

A variance exists when the evidence at trial establishes a different set of facts than those contained in the indictment. Dunn v. United States, 442 U.S. 100, 105 (1979); United States v. Koen, 31 F.3d 722, 724 (8th Cir. 1994) ("A variance occurs when the charging terms are left unaltered but the evidence offered at trial proves facts different from those alleged in the indictment."). A claim of a variance alleges constitutional error, for it pertains to a defendant's Sixth Amendment right to be adequately informed of the nature of the charges. Stuckey, 220 F.3d at 981. A defendant is only entitled to relief, however, if the variance does, in fact, infringe on his substantial rights. Ghant, 339 F.3d at 662; United States v. Mora-Higuera, 269 F.3d 905, 911 (8th Cir. 2001).

## A.    Continuing Criminal Enterprise and Conspiracy

The defendants contend that the government failed to prove a single conspiracy or continuing criminal enterprise, but rather presented evidence of simple buyer/seller transactions or smaller conspiratorial agreements to procure and distribute drugs. "Whether the government's proof established a single conspiracy or multiple conspiracies is a question of fact for the jury." United States v. Morales, 113 F.3d 116, 118 (8th Cir. 1997). When a claim of variance involves a conspiracy or continuing criminal enterprise conviction, we will reverse only if "the evidence does not support the single conspiracy and the defendant was prejudiced by the variance

between the indictment and proof." United States v. Pullman, 187 F.3d 816, 821 (8th Cir. 1999).

As discussed above, we are persuaded that the evidence presented here, taken in the light most favorable to the government, proved more than simple buyer/seller transactions. The defendants suggest that the jury verdicts on the conspiracy charges support their contention that the government may have proved several small conspiracies, but did not show a single conspiracy to distribute drugs over two decades. The jury found each of the defendants guilty of conspiring to distribute controlled substances, but differed as to which controlled substance each defendant was responsible for: Norman was found guilty of conspiring to distribute marijuana, methamphetamine, and cocaine; Schoenauer was found guilty of conspiring to distribute marijuana and methamphetamine; and Cuervo was found guilty of conspiring to distribute methamphetamine only.

Having reviewed the record, we cannot agree with the defendants. Consistent with the jury verdicts, the government presented evidence that connected Norman to a lengthy scheme to distribute numerous controlled substances. Simply because the jury found that Cuervo and Schoenauer's roles in the conspiracy involved different drugs does not direct the conclusion that there were multiple conspiracies. See United States v. Cabbell, 35 F.3d 1255, 1262 (8th Cir. 1994) (holding that a jury finding of a single conspiracy was not precluded by evidence that coconspirators entered the conspiracy at different times and assumed different roles). This is particularly true because the jury was properly instructed that the government was required to prove the defendants were members of the alleged conspiracy, not members of some other conspiracy. Even if the defendants were able to establish that the evidence proved multiple conspiracies, however, they have not shown how they were prejudiced by the purported variance. The jury findings were consistent with the indictment, as they convicted each defendant of conspiring to distribute controlled substances within the relevant statute of limitations. As noted above, we find the

indictment, together with the Bill of Particulars, provided the defendants with sufficient notice of the allegations against them. Certainly, in a complex case involving multiple defendants conspiring to distribute several different drugs over two decades, there is cause for concern that a single defendant may be prejudiced by evidence unrelated to his role in the conspiracy. Ghant, 339 F.3d at 662 (noting that a defendant may be prejudiced by the "spillover" of evidence from one conspiracy to another). Indulging the defendants' argument that the government proved several conspiracies rather than a single one, however, we fail to see how they were prejudiced. Indeed, if anything, the jury verdicts–finding each defendant guilty of conspiring to distribute different combinations of drugs–reflect a resolve on the part of the jury *not* to allow the so-called "spillover" of evidence to affect its verdicts. Rather, the jury found each defendant guilty for his respective role in the conspiracy. We thus find no prejudicial variance between this portion of the indictment and the proof at trial.

### B.    Schoenauer's Substantive Distribution Convictions

Schoenauer was convicted of two substantive counts of distributing methamphetamine, in violation of 21 U.S.C. § 841(a). The first of these, Count 8, charged him with distributing methamphetamine "[o]n or about Spring of 1996," (Appellant Norman's App. Vol. I at 12), and the second, Count 46, alleged methamphetamine distribution "[i]n or about 1997," (Id. at 52). The Bill of Particulars clarified that Count 8 was based on conduct occurring at a construction site, and Count 46 was alleged to have occurred in the Prairie Meadows casino parking lot. The evidence for both counts came from Patrick Rinkert, who testified that Schoenauer provided him with methamphetamine in the Prairie Meadows casino parking lot in January of 1997, and again at a construction site in March of 1997. Schoenauer claims error in that the evidence showed that the distributions happened on different dates, and in a different order, than as the government alleged.

"A variance between the date set forth in the indictment and the proof at trial is not fatal as long as the acts alleged were committed within the statute of limitations and before the date of the indictment." United States v. Harris, 344 F.3d 803, 805 (8th Cir. 2003). Here, the proof presented showed that both distributions to Rinkert occurred in 1997, rather than in 1996 and 1997. Moreover, the indictment specified that the dates given were approximations, as they did not allege a date certain and prefaced the time given with a statement that the dates were estimated. We could conceive of prejudice arising from the fact that the indictment alleged that Count 8 occurred before Count 46 whereas the proof showed just the opposite, but Schoenauer has not specified how he was adversely affected as a result of this variation. In the absence of such a showing, Schoenauer is not entitled to relief. Id.

## IV.  FIREARM USE IN FURTHERANCE OF THE CONSPIRACY

The defendants were charged with multiple violations of 18 U.S.C. § 924(c)(1)(A). Pursuant to § 924(c)(1)(A), if a defendant used, carried, or possessed a firearm in furtherance of a drug trafficking offense he is subject to an additional consecutive term of imprisonment. The evidence showed that both Cuervo and Norman possessed guns at some point during the drug conspiracy, and they were thus convicted on direct and vicarious liability theories.[10] On the government's motion, the court dismissed the vicarious liability convictions, leaving Norman and Cuervo each with only a single § 924(c)(1)(A) conviction and an additional sixty month consecutive sentence as a result.

## A.    Multiple § 924(c)(1)(A) Charges

Norman and Cuervo contend that it was error for the district court to allow the government to charge multiple § 924(c)(1)(A) violations. We disagree. In United

---

[10]Schoenauer was acquitted of these gun charges.

-27-

States v. Freisinger, 937 F.2d 383, 390 (8th Cir. 1991), our court held that the language and legislative history of § 924(c)(1)(A) supported the view that a defendant could be convicted under § 924(c)(1)(A) for each gun in his possession.[11] We thus held that the defendant's possession of four guns in furtherance of his drug trafficking offense supported convictions for four separate § 924(c)(1)(A) violations. Similarly, Norman's and Cuervo's multiple § 924(c)(1)(A) counts here were based on distinct conduct–Norman's gun use, and Cuervo's gun use. Each was charged with responsibility for their own conduct, as well as vicariously for the conduct of one another. See generally Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (holding partner in crime may be vicariously liable for acts of another in furtherance of the unlawful project). Given the unaltered rule of Freisinger, we find no error in the multiple § 924(c)(1)(A) charges.[12]

Cuervo next argues that there was a fatal variance between the charging documents and the jury instructions. In the indictment, he was alleged to have used, carried, *and* possessed a firearm in furtherance of the drug offenses, but the jury was instructed they could find him guilty if the evidence showed that he used, carried, *or* possessed a firearm. We do not believe Cuervo's substantial rights were prejudiced as a result of this grammatical difference. See United States v. Moore, 184 F.3d 790, 793-94 (8th Cir. 1999) (finding no error where defendant was indicted for conspiring to distribute cocaine *and* marijuana, but convicted following a jury instruction on conspiring to distribute cocaine *or* marijuana because change "did not expand the

[11]Freisinger recognized that other circuits had held that even possession or use of multiple firearms in furtherance of a crime will only support a single § 924(c)(1)(A) conviction. See Freisinger, 937 F.2d at 389-90.

[12]Even if Freisinger were not the rule of our circuit, Norman and Cuervo have failed to show any prejudice, since the government voluntarily dismissed all but one of the § 924(c)(1)(A) counts against each of them. Thus, even though they were charged and found guilty of multiple violations, as it stands each only has a single § 924(c)(1)(A) conviction.

bases upon which [the defendant] could be convicted"). The variance here did not materially alter the offense for which Cuervo was charged, and, in the absence of prejudice, he cannot prevail on this ground.

## B.      Ex Post Facto and Statute of Limitations Issues

Norman and Cuervo further argue that they were convicted under § 924(c)(1)(A) in violation of the Ex Post Facto Clause and beyond the statute of limitations. Because neither raised these issues below, we are constrained to review these issues for plain error. United States v. Olano, 507 U.S. 725, 731-34 (1993).

Both Norman and Cuervo contend that § 924(c)(1)(A) is not a continuing offense, but rather a so-called "point-in-time" offense. If that were the case, the government would have to show that Norman and Cuervo actually possessed, carried, or used guns within five years from the time the charge was brought to satisfy the statute of limitations. Moreover, because § 924(c)(1)(A) was amended in 1998 to include possession among the prohibited activity, Norman and Cuervo contend that the government must show that, prior to the amendment, they did more than merely possess a gun in furtherance of the conspiracy. The government responds that § 924(c)(1)(A) is a continuing offense, (i.e., if a gun is possessed once during the term of the conspiracy, the § 924(c)(1)(A) crime continues until the underlying conspiracy ends), and thus the statute of limitations and Ex Post Facto Clause are not implicated. The government further contends that, even if § 924(c)(1)(A) is a point in time offense, it was not plain error for the district court to hold to the contrary, and with regard to Cuervo, evidence still supports his conviction under his proffered construction of the statute.[13]

---

[13]The government concedes that no evidence links Norman directly to possession, use, or carrying of a firearm within the last several years.

We find guidance in the Supreme Court's decision in United States v. Rodriguez-Moreno, 526 U.S. 275 (1999). In Rodriguez-Moreno, the Court was faced with the issue of the proper venue for a § 924(c)(1)(A) offense. The defendant had kidnaped an enemy in New Jersey, and brought him to Maryland. Once in Maryland, the defendant brandished a firearm in furtherance of the kidnaping. The government conceded that there was no evidence the defendant used the gun in New Jersey. Nonetheless, the trial was venued in New Jersey, and the defendant was convicted. On appeal, he argued that the proper venue for the § 924(c)(1)(A) violation was Maryland, the only place he had used the gun. The Supreme Court agreed that the venue should be the place where an act making up part of the crime took place, id. at 279, but went on to hold against the defendant. The Court reasoned that the § 924(c)(1)(A) offenses have two basic elements: 1) the carrying, possession, or use of a firearm, and 2) the underlying offense that the carrying, possession, or use of the firearm is furthering. Id. at 280. Thus, § 924(c)(1)(A) could not be classified as a point-in-time offense because its nature depended on the underlying crime; if the underlying crime was a continuing offense, then so was § 924(c)(1)(A). Id. at 281. The underlying crime before the Court was a kidnaping, which continued until the victim was released. Thus, venue of the § 924(c)(1)(A) offense was proper anywhere that a portion of that crime, including the kidnaping, took place. Id. at 282 ("Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense.").

Applying the tenets of Rodriguez-Moreno, we find no statute of limitations or Ex Post Facto violations. One of the elements essential to a § 924(c)(1)(A) violation is the underlying crime. The statute of limitations for the violation does not begin to run until elements comprising the violation, including the underlying crime, have ceased. Rodriguez-Moreno, 526 U.S. at 281-82. The government presented evidence that the underlying crime in this case–the drug conspiracy–continued from 1978 through 2001. Thus, even though the defendants actually possessed the guns at

-30-

earlier points, the § 924(c)(1)(A) offenses continued to occur until the end of the conspiracy.

## C. Sufficiency of the Evidence

Norman also claims that the evidence was insufficient to convict him of the § 924(c)(1)(A) offense. Although he admits to possessing a firearm, he directs us to the government's failure to directly link his firearm possession to the conspiracy. To sustain a conviction, the government must present evidence that the defendant used, carried, or possessed a firearm in furtherance of a drug trafficking offense. 18 U.S.C. § 924(c)(1)(A).

There is no question that Norman often possessed firearms during the course of the conspiracy. During a 1994 traffic stop, he was found in possession of two guns. Moreover, Marylin Corbin, Brian Holst, Mark McPherson, Corey Pendarvis, Delane Evans, Chris Borst, and Joe Wetherby all observed Norman in possession of firearms. Notably, each of these witnesses was also involved in drug dealings with Norman. Some, such as Wetherby and Holst, did not directly connect the firearms to their drug transactions.

Given the record before us, we do not believe Norman could be convicted of "using" the firearm in furtherance of the conspiracy, for that would require proof that he actually employed a gun in furtherance of the crime. Bailey v. United States, 516 U.S. 137, 144 (1995). While simultaneous possession of both guns and drugs alone does not establish possession of a firearm in furtherance of the drug conspiracy, proximity of firearms to drugs may "support an inference that the firearms were possessed so as to be readily available to protect the drugs." United States v. Hamilton, 332 F.3d 1144, 1150 (8th Cir. 2003).

Although a close case, there is sufficient evidence to convict Norman of possessing firearms in furtherance of the drug conspiracy. We are troubled by the failure to directly connect Norman's firearm possession to his drug activities. However, the breadth of the conspiracy, the fact that the firearms were often in the same location as the drugs or where the transactions originated, and the consistent testimony from those involved in drug transactions with Norman that he possessed firearms, we find no error in the jury's determination that Norman's possession of weapons overlapped with and furthered the aim of his drug transactions.

## V.    EXPERT TESTIMONY OF SCHOENAUER'S WEALTH

Schoenauer contends that the district court committed reversible error by allowing Brad Richards, an auditor with the ATF, testify as an expert to establish that Schoenauer's wealth exceeded his income. Richards considered Schoenauer's tax returns from 1992-98 and compared the income and revenue figures to financial data from the same period that Schoenauer had submitted to a bank for loan transactions. Richards submitted that, during that period, Schoenauer's investments totaled roughly $2.9 million, while his available income was only $262,200. He concluded that Schoenauer thus had about $2.6 million of unexplained income for those years. Schoenauer now argues that it was prejudicial error for the district court to admit the testimony of Richards. The government contends that the evidence was properly admitted, and, even if it was erroneously admitted, the error was harmless.

We review the district court's decision to allow expert testimony for an abuse of discretion. United States v. Kehoe, 310 F.3d 579, 593 (8th Cir. 2002). To be admissible, expert testimony must be both relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). There is no question that Richards testified on a relevant matter; he spoke directly to the issue of money that the government alleged was derived from the drug conspiracy. As to reliability, Schoenauer contends that Richards's testimony did not conform to the standards applicable in tax

prosecutions. Under that standard, the so-called "net worth method" of proving unaccounted for income, the government must: 1) establish an opening net worth; 2) investigate leads of potential income sources, and 3) show that increases in net worth are attributable to unexplained income. See Holland v. United States, 348 U.S. 121, 132-38 (1954). The government responds that the method explained in Holland is only required in tax prosecutions, not drug cases.

We have found no clear precedent in our circuit on the issue of whether Holland applies to non-tax cases. The Second Circuit and Eleventh Circuit have held that Holland does not apply to drug cases, see United States v. Falley, 489 F.2d 33, 40 (2d Cir. 1973) and United States v. Gonzales, 21 F.3d 1045, 1048 (11th Cir. 1994), and the Sixth Circuit has intimated that Holland would not apply in a bank theft case, see United States v. Vannerson, 786 F.2d 221, 223 (6th Cir. 1986). We agree with those circuits that Holland should not strictly apply in non-tax cases. In tax prosecutions like Holland, a stringent standard is necessary because the crime in tax cases includes financial gain as an element. When the government is seeking to prove an element of the offense exclusively by expert testimony, a district court should hold the government to a strict standard for admitting that evidence. Accord Falley, 489 F.2d at 40. However, financial gain is not an element of any of Schoenauer's offenses of conviction.[14] Thus, we find no reversible error in the district court's decision to allow Richards to testify as an expert regarding Schoenauer's wealth.

---

[14]We may have a different view if Schoenauer was, in fact, convicted of maintaining a continuing criminal enterprise, for that crime requires proof that the defendant gained substantial income or resources as a result of the scheme. See 21 U.S.C. § 848(c)(2)(B).

## VI.  JURY INSTRUCTIONS FOR NORMAN'S CONTINUING CRIMINAL ENTERPRISE CONVICTION

Norman argues that the jury instructions on the elements of a continuing criminal enterprise were wrong and warrant reversal.  Because Norman did not object to the instructions at trial, we review for plain error.  United States v. Hall, 325 F.3d 980, 981-82 (8th Cir. 2003).  Under this standard, we reverse only if the error affected the defendant's substantial rights, and a miscarriage of justice would result if the error were left uncorrected.  Id. at 982.

"To support a [continuing criminal enterprise] charge, the government must prove 'the commission of a continuing series of violations of federal narcotics law, in concert with five or more persons, by a person occupying a management or organizing position, who receives substantial income therefrom.'"  United States v. Rockelman, 49 F.3d 418, 420 (8th Cir. 1995) (quoting United States v. Becton, 751 F.2d 250, 254 (8th Cir. 1984)).  In this case, the district court did not instruct the jury that its verdict must be unanimous with regard to the people Norman was alleged to have supervised.  He argues that the failure to give such a unanimity instruction was plain error.

Norman concedes that "[p]rior Eighth Circuit authority holds that specific unanimity as to the group census element is not required in order to establish a [continuing criminal enterprise] violation."  (Appellant Norman's Br. at 27 (citing United States v. Jelinek, 57 F.3d 655, 658-59 (8th Cir. 1995) and United States v. Rockelman, 49 F.3d 418, 421 (8th Cir. 1995))); see also United States v. Montanye, 962 F.2d 1332, 1341 (8th Cir. 1992), *cited with approval in reh'g en banc,* United States v. Montanye, 996 F.2d 190, 194 (8th Cir. 1993).  He nonetheless urges us to reconsider our prior precedent in light of United States v. Richardson, 526 U.S. 813 (1999).

In Richardson, the Court was faced with the issue of whether a jury must unanimously agree on which specific felony violations made up the series necessary to support a continuing criminal enterprise conviction. At trial, the defendant had asked the district court to instruct the jury that they must unanimously agree on which three prior violations made up the series. The court refused, and instead instructed the jury that they did not have to agree on the particular violations so long as they all agreed that the defendant had engaged in at least three prior violations as part of the criminal enterprise. Id. at 817. On appeal, the Court recognized that it was called upon to decide:

> whether the statute's phrase "series of violations" refers to one element, namely a "series," in respect to which the "violations" constitute the underlying brute facts or means, or whether those words create several elements, namely the several "violations," in respect to *each* of which the jury must agree unanimously and separately. Our decision will make a difference where, as here, the Government introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a "series."

Id. at 817-18. After thoroughly reviewing and interpreting the relevant statutory language, the Court held that there was a unanimity requirement for the violations making up the "series of violations" portion of the continuing criminal enterprise statute. Id. at 824.

Norman argues that if juror unanimity is required for each violation making up the series for continuing criminal enterprise convictions, unanimity must also be required for the jury's findings with respect to which persons make up the five or more persons that a continuing criminal enterprise defendant is alleged to have supervised. He suggests our decision in Rockelman and its progeny have effectively been overruled by the Supreme Court's decision in Richardson. In Richardson, the

Court reasoned that "[t]o hold that each 'violation' here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not." Id. at 813. Richardson was based on the view that a "violation" was more than just an element in support of a continuing criminal enterprise conviction, because each act was itself a crime. In dicta, the Court expounded on how this was different than other elements of a continuing criminal enterprise offense:

> the Government points to a different portion of the statute, which requires a defendant to have supervised "five or more other persons." 21 U.S.C. § 848(c)(2)(A). The Government says that no one claims that the jury must unanimously agree about the identity of those five other persons. Its adds that the jury may also disagree about the brute facts that make up other statutory elements such as the "substantial income" that the defendant must derive from the enterprise, § 848(c)(2)(B), or the defendant's role in the criminal organization, § 848(c)(2)(A). Assuming, without deciding, that there is no unanimity requirement with respect to these other provisions, we nonetheless find them significantly different from the provision before us. They differ in respect to language, breadth, tradition, and the other factors we have discussed. These considerations, taken together, lead us to conclude that the statute requires jury unanimity in respect to each individual "violation."

Id. at 824. Decisions of sister circuits since Richardson have generally declined to extend the jury unanimity requirement to the "five or more persons" provision of continuing criminal enterprise violations, see United States v. Short, 181 F.3d 620, 624 (5th Cir. 1999); see also United States v. Almaraz, 306 F.3d 1031, 1038-39 (10th

Cir. 2002); <u>United States v. Stitt</u>, 250 F.3d 878, 886 (4th Cir. 2001),[15] but we have not had occasion to reconsider this issue since <u>Richardson</u>.

We recognize the significance of the right to a unanimous jury verdict. <u>Apodaca v. Oregon</u>, 406 U.S. 404 (1972). We reiterate, however that we review this matter only for plain error, meaning that the error must first be "plain" or "obvious." <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993). Given our precedent, we cannot say that Norman has satisfied us that any error with regard to the failure to give a unanimity instruction was a plain or obvious one. Our holding is buttressed both by the Supreme Court's limiting language in the <u>Richardson</u> opinion, and the decisions of our sister circuits since <u>Richardson</u>. Thus, while we may agree that a unanimity instruction for the group census will safeguard a continuing criminal enterprise defendant's right to a unanimous jury verdict, the failure to give such an instruction here does not warrant reversal.

## VII. COURT RESPONSE TO JURY QUESTIONS

The defendants next argue that the district court erred in its response to a jury question, and the error was so prejudicial as to warrant a new trial. Prior to trial, the government was ordered to state on the record the counts for which its witnesses were testifying at the time each witness took the stand. It complied with the order for the majority of government witnesses, and the jury was informed before each witness testified what counts their testimony concerned. The defendants were not required

---

[15]The notable exception is the Ninth Circuit, which has held that unanimity is required for the identity of the five persons alleged to be acting in concert since long before the Supreme Court's decision in <u>Richardson</u>. <u>United States v. Jerome</u>, 942 F.2d 1328, 1331 (9th Cir. 1991).

to follow the same procedure for their examination of government witnesses, nor their own witnesses. During their deliberations, the jury made the following inquiry:

> The prosecution named the counts with certain witnesses. Do you only take the testimony of that witness for that particular count and no other testimony can be use[d]?

(Trial Tr. Vol. XXIII at 4686.) After conferring with counsel, the district court responded by stating that "[y]ou may consider all testimony from all witnesses in arriving at your verdicts." (Id. at 4688.) Norman agreed to this response, but Cuervo and Schoenauer objected to it. All defendants now argue that the trial court's response prejudiced them by removing previously imposed limitations on the evidence and frustrating their trial strategies.

Because Norman agreed to the trial court's response, he is precluded from taking a contrary position before us. See United States v. Thompson, 289 F.3d 524, 526 (8th Cir. 2002) (holding that the defendant's assent to the district court's course of action differs from inadvertently failing to object to such action and is thus not subject to even plain error review).

As to Cuervo's and Schoenauer's properly preserved arguments, we review a district court's responses to jury questions for an abuse of discretion. United States v. Smith, 104 F.3d 145, 148 (8th Cir. 1997). A trial judge's response must be clear, accurate, neutral, and non-prejudicial. United States v. Martin, 274 F.3d 1208, 1210 (8th Cir. 2001). Moreover, the judge should answer with concrete accuracy, limited to the scope of the question asked. Id.

In its discussion with counsel, the court explained that it believed its response was appropriate because although the government announced which counts each witness was testifying about for many of its witnesses, it neglected to make such an announcement for a few of them. Moreover, the court further reasoned that cross-examination may have touched on matters outside the scope of the announced counts. Lastly, the defendants did not have to announce what counts each of its witnesses were testifying about. We accept these rationales as reasonable, and find no abuse of discretion in the district court's response.

## VIII. SCHOENAUER'S FORFEITURE TRIAL

Following his convictions related to the drug conspiracy, the district court commenced a forfeiture trial related to a number of Schoenauer's properties. The jury found that four of the properties were subject to forfeiture, but the court altered the verdict by returning one of the four to Schoenauer. Schoenauer contends that this trial was infected with error and that the evidence presented at the trial was insufficient to convict him.

Property is subject to forfeiture where the government proves by a preponderance of the evidence that it was used or intended to be used to commit or facilitate the commission of the underlying offense. 21 U.S.C. § 853(a)(2); United States v. Bieri, 21 F.3d 819, 822 (8th Cir. 1994) (standard of proof). The evidence at trial established that each property was used to store and distribute marijuana and methamphetamine. While we have affirmed forfeitures of properties where drugs were stored and transactions occurred, there must be more than "incidental or fortuitous contact" between the property and the underlying offense. United States v. Lewis, 987 F.2d 1349, 1356 (8th Cir. 1993). After thoroughly reviewing the trial transcript and considering the government's lesser burden in forfeiture proceedings,

we find the evidence presented was sufficient to support the forfeiture of these properties.

Schoenauer also argues that numerous trial errors infected his forfeiture proceeding. Many of these do not merit discussion. We briefly address, however, his claim that he was denied the effective assistance of counsel. At the end of the drug conspiracy trial, his trial attorney informed the court that he would be out of town for a few days, but that his partner could stand in to receive the verdict. The guilty verdicts came in shortly after Schoenauer's lawyer left town, and the district court sought to go forward with the forfeiture proceeding. Standby counsel told the court that because he did not attend the trial, he had no way to effectively represent Schoenauer. Unpersuaded, the district court ordered that the forfeiture trial would proceed after the jury was given a one-day break. Before commencement of the trial, standby counsel reminded the district court that Schoenauer had not consented to going forward without his trial attorney.

We believe this claim is better suited to collateral attack pursuant to 28 U.S.C. § 2255 than for us to decide on direct appeal. Accord Casas v. United States, 99 F.3d 1144 (8th Cir. 1996) (unpublished table decision); Autullo v. United States, 81 F.3d 163 (6th Cir. 1996) (unpublished table decision). At that time, Schoenauer would be required to establish that counsel was constitutionally required for his forfeiture proceeding, and, if so, that he was denied the assistance of counsel in such a way as to prejudice his defense.

## IX. SCHOENAUER'S FIREARM CONVICTIONS

In an unrelated but consolidated proceeding, Schoenauer was convicted of three counts of possession of a firearm by an ineligible person. 18 U.S.C.

§ 922(g)(9). He argues that § 922(g)(9) is unconstitutionally vague as applied to him, that there was insufficient evidence to support the conviction, and that evidentiary errors affected the fairness of his trial.

Under § 922(g)(9), it is unlawful for a person who has been convicted of a misdemeanor crime of domestic violence to possess a firearm. A crime of domestic violence is defined as one which involves the use or threatened use of physical force or a deadly weapon "by a person who is cohabitating with or has cohabitated with the victim as a spouse" or "by a person similarly situated to a spouse . . . of the victim." 18 U.S.C. § 921(33)(A)(ii). Schoenauer had previously been convicted of assaulting his secretary, whom he had engaged in a long-term extramarital affair. The evidence showed that she and Schoenauer stayed together periodically at an apartment Schoenauer kept. During this time, Schoenauer remained married and lived with his wife. Schoenauer argues that the statute is unconstitutionally vague as applied because under his unique circumstance–perpetrating an assault on someone who was his partner in an extramarital affair–he could not tell if his conduct fell within the confines of the statute. For support, Schoenauer directs us to evidence that he tried to comply with the statute by checking with two different attorneys after its passage to ensure he could still possess guns. According to Schoenauer, both attorneys told him that he could keep his firearms. He did not present this evidence at trial, and only did so at sentencing through a letter from one of the attorneys.

We find no merit to Schoenauer's claim. To determine whether a statute is unconstitutionally vague, we consider whether people of ordinary intelligence must guess at the statute's meaning and would differ as to their interpretation. United States v. Smith, 171 F.3d 617, 622 (8th Cir. 1999). A common read of the statute would alert a person of ordinary intelligence that the phrase "similarly situated to a spouse" is meant to include assaults perpetrated against those who are not spouses, yet share their defining characteristics. Schoenauer was not left without direction as

to the statute's meaning; rather, its very terms make clear that his prior conviction for assaulting his affair partner may preclude him from possessing firearms. Accord United States v. Thompson, 134 F. Supp. 2d 1227, 1229-30 (D.Utah 2001) (finding the phrase "similarly situated to a spouse" was not unconstitutionally vague as applied to defendant's battery conviction perpetrated on his girlfriend). While he alleges that the misadvice of his counsel led him to the opposite conclusion, we find this evidence–which was not presented at trial–at odds with a common sense interpretation of the statute.

Schoenauer next contends that the evidence cannot support his convictions. At trial, he stipulated to his gun possession, but contested the fact that the prior assault was a crime of domestic violence. The statute includes as domestic violence crimes those perpetrated on a person similarly situated to a spouse of the defendant. While Schoenauer's victim was not his spouse, the evidence showed that she shared an intimate personal relationship with Schoenauer. Thus, the jury was free to determine, as a factual matter, that she was in a position similar to a spouse. We will not disturb that finding.

Lastly, Schoenauer contends that the district court abused its discretion in admitting certain evidence at trial. "We afford great deference to the district court's evidentiary rulings, reversing only where there has been a clear abuse of discretion." United States v. Briley, 319 F.3d 360, 363 (8th Cir. 2003). At trial, Schoenauer sought to establish that his marriage was stable in order to show his abuse victim was not "spouse-like." He tried to do so through his own testimony, and the testimony of his wife that their marriage was good. The district court permitted the government to cross-examine Schoenauer's wife about Schoenauer's extramarital affairs and children born out of wedlock, and to question him about his affairs.

Particularly because of Schoenauer's defense that his marriage precluded him from having someone similarly situated to his spouse, we find this line of questioning was properly permitted by the district court. As recognized by the district court, Schoenauer himself opened the door for this evidence to be admitted. Although prejudicial, this evidence is clearly relevant, and we find no abuse of discretion in its admittance.

## X.    SENTENCING ISSUES

Norman and Schoenauer appeal the district court's sentencing determinations, and the government cross-appeals the district court's two-level downward departure for Schoenauer. Norman and Schoenauer both argue that the district court clearly erred in determining drug quantity, and Norman argues that the district court further erred by enhancing his sentence by four levels for being a leader or organizer. Norman also contends the district court applied the wrong version of the Sentencing Guidelines.

Norman suggests that the version of the Sentencing Guidelines in effect prior to November of 1997 should have been used to determine his sentence. However, because evidence at trial established that the drug conspiracy did not end until long after November of 1997, the more recent version of the Sentencing Guidelines was the appropriate version to use. United States v. Zimmer, 299 F.3d 710, 718 (8th Cir. 2002) (holding "where a defendant's offense conduct straddles [a Sentencing Guideline's] enactment, the enactment can be applied to the defendant without violating the Ex Post Facto Clause even when the enactment would result in a harsher sentence").

Drug quantity determinations are factual in nature; thus, we review such findings for clear error. United States v. Maggard, 156 F.3d 843, 848 (8th Cir. 1998). The district court determined the drug quantity based on its recollection of the trial testimony, an appropriate method of calculation. Id. Although the defendants argue that the witness testimony at trial was inconsistent and incredible, we find those determinations to be squarely within the province of the district court's role as the finder of fact.

We similarly reject the claim that the evidence did not support the district court's enhancement for Norman's role as a leader or organizer. Reviewing for clear error, United States v. Lashley, 251 F.3d 706, 712 (8th Cir. 2001), we find none. Sentencing Guideline § 3B1.1(a) mandates that a defendant's sentence be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants." Trial testimony established that Norman exercised authority over, and directed the activities of, at least five other participants, and perhaps more. In light of this evidence, the district court did not err in applying the § 3B1.1 enhancement.

Lastly, we address the government's contention that Schoenauer's two-level departure was not warranted. We review the departure de novo. United States v. Hutman, 339 F.3d 773, 775 (8th Cir. 2003). Schoenauer received a two-level increase in his offense level for possessing a dangerous weapon–his firearms–during the drug crimes. The two-level departure in this case was based on the district court's belief that Schoenauer had tried to conform his firearm possession to the law, as evidenced by Schoenauer's reliance on past counsel's advice that he could legally possess firearms notwithstanding his misdemeanor conviction. In other words, Schoenauer would not have possessed a dangerous weapon if not for his attorney's mistaken advice. Finding that this made Schoenauer's case exceptional and outside the heartland of cases considered by the Sentencing Commission, see USSG § 5K2.0,

-44-

p.s., the district court departed two levels, and sentenced Schoenauer to 210 months, or 17.5 years, in prison. While the district court may not rely on an improper factor to support a departure, cf. United States v. Petersen, 276 F.3d 432, 436 (8th Cir. 2001), we cannot say that a person's attempted adherence to the law is irrelevant when considering his sentence. We accordingly find no error in the district court's departure.

## CONCLUSION

Having thoroughly considered the extensive evidence and arguments of the parties in this case, we affirm in all respects the convictions and sentences of Robert Lee Norman, Russell J. Schoenauer, and Pelayo Jose Cuervo.

_____